**Charlie H. BROWN, Jr., Plaintiff,**

v.

**Louis M. SULLIVAN, M.D., Secretary of Department of Health and Human Services of the United States of America, Defendant.**

No. 88–1230.

United States District Court,
C.D. Illinois.

May 14, 1990.

Thomas Henry, Peoria, Ill., for plaintiff.

K. Tate Chambers, Asst. U.S. Atty., Peoria, Ill., for defendant.

## ORDER

MIHM, District Judge.

Before the Court are a Motion by the Plaintiff for summary reversal (# 9–1) and a Motion by the Defendant for summary affirmance (# 17–1) of a final decision of the Secretary of the Department of Health and Human Services denying disability benefits to the Plaintiff. This Court grants the Plaintiff's Motion for Summary Reversal (# 9–1) and denies the Defendant's Motion for Summary Affirmance (# 17–1). The Court reverses and remands the decision of the Secretary and orders that further action be taken in accordance with the findings of this opinion.

## PROCEDURAL BACKGROUND

On September 3, 1986, the Plaintiff filed applications for disability insurance benefits and Supplemental Security Income benefits, alleging that he had been disabled since December 2, 1980, due to seizures and alcoholism. (AR 73–76)[1]. Both applications were denied initially (AR 71) and on reconsideration (AR 79). An Administrative Law Judge (ALJ) considered the case *de novo*, and on October 15, 1987, found that the Plaintiff had demonstrated that he had been disabled, within the meaning of the Social Security Act, since September 3, 1986. (AR 16–17). Since the Plaintiff met the insured status requirements of the Act only through March 31, 1984, the ALJ further found that he was eligible only for Supplemental Security Income benefits under Title XVI of the Act and not for disability insurance benefits under Title II of the Act. (AR 16–17)[2]. The ALJ found that the Plaintiff met the requirements for Supplemental Security Income benefits under Title XVI of the Act under Listing 12.02 and 12.09. This decision of the ALJ became the final decision of the Secretary when the Appeals Council denied review on June 3, 1988. (AR 3–4). Thereafter, the Plaintiff filed a timely complaint for administrative review in this Court.

## BACKGROUND FACTS

The medical evidence in the record indicates that the Plaintiff was treated for non-specific urethritis[3] in February 1975, at which time the Plaintiff complained of urinary frequency and noted a pattern of heavy drinking. (AR 164–165). Continued heavy drinking was reported in the examination notes of the Memphis Health Center in the months of January and February of 1976 (AR 171–175), although the results of a neurological examination were within

---

1. Hereinafter, numerical references are to the Administrative Record unless otherwise provided.

2. Title II is in essence a federally administered system of disability insurance, and an individual must have "insured status" at the time that his disability began in order to be entitled to benefits thereunder. "Insured status" is based upon the individual's prior earnings record, a portion of which earnings are paid into the Social Security trust fund. There is no "insured status" requirement for SSI benefits under Title XVI.

3. Urethritis is defined as "inflammation of the urethra," the canal which conveys urine from the bladder to the exterior of the body. *Dorland's Illustrated Medical Dictionary*, 1425 (26th Ed.).

normal limits. (AR 175). During the later examinations, Plaintiff complained of seizures for which Dilantin and Phenobarbital were prescribed. (AR 171–173). The Plaintiff was subsequently treated for alcoholism at the Tennessee Psychiatric Hospital Alcohol and Drug Clinic from March 16 through March 26, 1976. This treatment was granted by request as an alternative to incarceration for driving while intoxicated. (AR 176–177).

On April 25, 1977, the Plaintiff underwent a neuropsychiatric examination by Dr. Justin Adler, at which time the Plaintiff complained of headaches, nervousness, and seizures, and he reported that the seizures were being controlled by medication which he had started using approximately five years before. (AR 178–180). The Plaintiff further reported a history of "using alcohol occasionally to excess," but noted that "at the present time" he did not "drink much." (AR 179). Dr. Adler noted that the Plaintiff was of average intellectual endowment without any significant disturbances. Specifically, Dr. Adler found no evidence of paranoia, delusions, hallucinations, obsessions, or tendencies toward elation or depression, and further found no evidence of atrophy, dystrophy, neuromuscular disturbances, or sensory abnormalities. Electroencephalographic (EEG) [4] testing was normal and negative for the presence of a seizure disorder or encephalopathy [5] (AR 181), and Dr. Adler expressed doubt that epilepsy was involved. (AR 180). Dr. Adler opined that the Plaintiff retained the functional capacity for employment as long as he abstained from alcohol. (AR 180).

The next recorded examination of the Plaintiff is contained in a report dated December 26, 1978, by Dr. Glenn Horton, an internist. (AR 197–201). Plaintiff again indicated that he had stopped drinking. (AR 200). Testing was negative for alco-

holic neuropathy or cirrhosis of the liver. Results of physical and neurological examinations were all within normal limits, and the Plaintiff was described as oriented in all spheres without abnormal thought content or tremors. In Dr. Horton's view, there appeared to be a "disproportion in symptoms and findings," since the Plaintiff "does not appear to be particularly ill" and demonstrated "very little in terms of medical impairment." (AR 198–199). Dr. Horton opined that the Plaintiff retained the functional capacity for "any type of prior industrial activity" except for working with moving machinery and moving vehicles, the latter caveat being attributable to the Plaintiff's allegations of a seizure disorder. (AR 200).

The Plaintiff was thereafter rechecked for complaints of seizures and headaches on January 3, 1979 and for a urinary complaint on March 5, 1979. (AR 183). The results of these examinations are not recorded.

The Plaintiff's condition from March 5, 1979 through September 29, 1986 is wholly undocumented, and the Plaintiff's next recorded medical contact consists of a consultive examination by Dr. Donald E. Hurd on September 29, 1986. (AR 186–188) [6]. Dr. Hurd noted that the Plaintiff's daily activities included self-care, watching television, and socializing. (AR 186). The Plaintiff's full-scale I.Q. score of 76 on the Wechsler Adult Intelligence Scale was said to be in the borderline mentally retarded range. The Plaintiff's verbal I.Q. was 78 and his performance I.Q. was 75 with a full-scale I.Q. of 76. Dr. Hurd commented that the Plaintiff's verbal facilities gave the impression that he might be more capable than present scores would indicate. The Plaintiff scored an I.Q. of 85 on the Peabody Picture Vocabulary Test. (AR 187). Dr. Hurd questioned whether, "considering his

---

**4.** An EEG records the brain's electrical currents, and is utilized in diagnosing neurological conditions. *Dorland's,* 426.

**5.** Encephalopathy is defined as "any degenerative disease of the brain." *Dorland's,* 438.

**6.** This examination and subsequent examinations by Dr. Richard Brady (AR 189–193) and Dr. James Weimer (AR 225–230) were undertaken at the request of the state disability determination services or the ALJ in connection with the Plaintiff's claim for benefits.

lifestyle," the Plaintiff could manage his own funds. (AR 187).

The Plaintiff underwent a second consulting examination on October 8, 1986, which was conducted by Dr. Richard A. Brady, a psychiatrist. (AR 189–193). The Plaintiff indicated that he started drinking at the age of 21 and that he now drank frequently, but not on the day of the interview or on a daily basis. He reported that he had been hospitalized twice, both times prior to his move to Illinois in 1980, and he stated that he was told in 1968 or 1969 that he had cirrhosis of the liver and just six months to live. The Plaintiff described a wide range of activities and social involvements, including extensive reading, playing pool, eating out at restaurants, and the performance of yard work and odds-and-ends jobs (which might indicate that he could perform household chores without assistance). He further stated that he wanted to work but that he had difficulty finding employment, and he stated that he was intermittently depressed, though not most of the time. Dr. Brady noted the absence of delusions and hallucinations or suicidal ideation. Also, he found that the plaintiff was oriented in all his mental spheres and had fair immediate memory. He did have some deficiencies in recent and remote memory. Further, Dr. Brady described the Plaintiff's intelligence as below average but not mentally retarded. His diagnosis was alcohol dependence, generalized anxiety disorder, and atypical organic brain syndrome.

Dr. Brady further noted that the Plaintiff was not taking his seizure medication as prescribed. (AR 190). Two months later, the physicians at St. Joseph's Medical Center also noted that the Plaintiff was not taking his medication and attributed a seizure episode to his failure to take his medication. (AR 194–196). The Plaintiff denied any pain and stated that he had abstained from alcohol the prior day. This fact was confirmed by laboratory testing for alcohol. (AR 196). A subsequently reported seizure, on April 10, 1987, was similarly attributed to Plaintiff's failure to take his medication. (AR 221).

The final piece of medical evidence submitted, dated July 29, 1987, consists of a report of a consultative examination conducted by Dr. James Weimer, a specialist in internal medicine. (AR 225–230). Dr. Weimer reported that the results of physical and neurological examinations of the Plaintiff were generally unremarkable and within normal limits and that the Plaintiff had no muscular or skeletal impairments. The doctor reported that the Plaintiff claimed that his seizures and alcohol abuse began when he was six. Also, the Plaintiff reported a sporadic use of his anti-seizure medications. Assessing the Plaintiff's capacity to perform work-related activities, Dr. Weimer noted that Plaintiff was physically stable and without significant functional impairment except for work involving climbing, balancing, heights, and moving machines, which exceptions were attributed to Plaintiff's reported history of convulsive seizures. (AR 228–229).

The ALJ also considered vocational and other non-medical evidence. The Plaintiff was born on October 12, 1941, had 12 years of formal education, and past work experience as an automobile mechanic (AR 101) and moving van driver. (AR 39). The latter work involved lifting in excess of 100 pounds. (AR 106). The Plaintiff indicated that he had never been discharged from employment due to alcoholism (AR 50) and that his impairments had not significantly impacted upon his performance of his most recent work. (AR 97). It appears that he was discharged from his job as a van driver due to unexplained and unexcused absences. (AR 216). Although the Plaintiff alleged in February 1977 that he was disabled and unable to work (AR 65, 89), he later admitted that he had worked until 1979. (AR 39, 101). Although he expressed a desire to return to work and hoped that he was capable of working, he reported that he had difficulty finding employment. (AR 190–191).

Describing his regular activities, the Plaintiff reported that he engaged in housecleaning, shopping, yard work, odd jobs, dining out, socializing, attendance at church, watching television, and playing pool. (AR 192, 208). He also noted that he

had a good relationship with his family and friends and a good appetite. (AR 45, 180, 208).

One month prior to the administrative hearing, the Plaintiff indicated that he could perform home chores, bend, squat and lift, and that he had no difficulty with standing or walking. (AR 208). By contrast, at the hearing, the Plaintiff stated that he had difficulty with walking, standing, and sitting, (AR 43–44), and he alleged difficulties due to seizures, cramping, headaches, drinking, and anxiety. (AR 40, 44–46, 52). He further testified that his seizure disorder was his primary impairment and that it began in 1964. (AR 50–51). However, he indicated that no physicians had ever restricted his activities as a result of the seizures and stated that he had not received medical treatment for several years. (AR 45, 113).

In a post-hearing statement dated July 2, 1987, Mary Brown, whose relationship to the Plaintiff is unknown, stated that "Plaintiff has been a serious, uncontrolled drinker for at least the past ten years" and that his seizure problem has pre-dated the 21 years of her acquaintance with the Plaintiff. Ms. Brown further stated that Plaintiff's drinking had interfered with his performance of daily activities and self-care, and she opined that he was "totally disabled" and unable to hold a job. (AR 218–19).

## APPLICABLE LAW

■■ In order to be entitled to disability benefits under SSI, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits. *See*, 20 C.F.R. §§ 404.-1566, 416.966 (1986).

■ The establishment of disability under the Social Security Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir.1980). That factual determination is made by using a five step test. *See*, 20 C.F.R. §§ 404.1520, 416.920.

■ The five step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed?; (2) is the plaintiff's impairment "severe?" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments? (20 C.F.R. Part 404, Subpart P, Appendix 1); (4) is the plaintiff unable to perform his or her former occupation?; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir.1984).

■ The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Secretary to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir.1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir.1984).

The rules in the grid, set out in Appendix 2 of Subpart P of 20 C.F.R. Part 404, are considered in determining whether a plaintiff with exertional impairments is or is not disabled. The regulations provide that if an individual suffers from a non-exertional impairment, as well as an exertional impairment, both are considered in determining residual functional capacity. 20 C.F.R. §§ 404.1545, 416.945. If a finding of disability cannot be made based upon exer-

tional limitations alone, the rules established in Appendix 2 are used as a framework in evaluating disability. In cases where the individual has solely a non-exertional impairment, such as pain or mental impairment, a determination as to whether disability exists is based on the principles in the appropriate sections of the regulations, giving consideration to the rules for specific case situations in Appendix 2.

■ The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence. The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir.1986). In determining whether the ALJ's findings are unsupported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

## DECISION OF THE
## ADMINISTRATIVE LAW JUDGE

The ALJ began with the finding that the Plaintiff had not engaged in substantial gainful activity since 1979, thus meeting the threshold requirement of Step 1. The ALJ proceeded to determine whether the Plaintiff's impairments were included or equal in severity to those found in the "listing of impairments" at 20 C.F.R. Part 404, Subpart P, Appendix 1 (step 3). Upon an exhaustive examination of the evidence of record, the ALJ found that Plaintiff's alcoholic condition rendered him presumptively disabled pursuant to § 12.09 of the listing of impairments since September 3, 1986, but not prior thereto. Based upon

such determination, the Plaintiff was deemed to be eligible for Supplement Security Income benefits based upon disability under Title XVI of the Social Security Act.

■ Unlike the case with benefits under Title XVI, however, a claimant for disability insurance benefits under Title II of the Act must demonstrate that he was disabled prior to the expiration of his disability insured status, which in Plaintiff's case was on March 31, 1984. Since the medical evidence did not demonstrate that Plaintiff's impairments were included in the listing of impairments (and were therefore presumptively disabling) until September 3, 1986, the ALJ determined that Plaintiff could not perform his past work as a truck driver prior to the expiration of his insured status. The ALJ concluded in step 4 that before September 3, 1986, the Plaintiff retained the capacity to perform all types of heavy work activity on a sustained basis with the exception of working around moving machinery or moving vehicles.

In the fifth step of his analysis, the ALJ utilized the medical-vocational guidelines found at 20 C.F.R. Part 404, Subpart P, Appendix 2, § 204.00, to determine whether the Plaintiff qualified as "disabled," prior to the expiration of his insured status in light of his residual functional capacity, age, education, and work experience. In light of these guidelines, the ALJ concluded that the Plaintiff had not been under a "disability" within the meaning of the Social Security Act prior to the expiration of his insured status and that he was therefore not entitled to disability insurance benefits pursuant to Title II.

## DISCUSSION

In the instant case, the parties agree that the Plaintiff was disabled as of September 3, 1986. The only real dispute concerns the ALJ's finding that the Plaintiff was not disabled as of March 31, 1984, the date on which Plaintiff's disability insured status expired.[7] The Plaintiff has alleged that

---

7. The law requires a claimant for disability insurance benefits to prove that his disability

arose before the expiration of his insured status. 42 U.S.C. §§ 416(i)(3), 423; *Meredith v. Bowen*,

this determination is not supported by substantial evidence in the record on several bases.

## A. *Development of the Record*

The Plaintiff claims that the first error of the ALJ and the Secretary is that they failed to fully develop the file and failed to obtain consultative psychological and psychiatric testing even though requested by the Plaintiff, who did not have the resources to obtain this evidence. The Plaintiff specifically requested these tests in a letter from his representative dated June 1, 1987 (AR 210, 211) to the ALJ. The Plaintiff asserts that the Secretary should have projected the Plaintiff's chronic alcoholism and dizziness and memory impairments as functional limitations as of the date he was last insured for Social Security disability in March of 1984.

In the Seventh Circuit case of *Ray v. Bowen*, 843 F.2d 998 (7th Cir.1988), the Court remanded the case for a claimant who was a chronic alcoholic for projective psychological and psychiatric testing to determine the extent and degree of his impairment as of a former period of time. The Court cited its former decision of *Stark v. Weinberger*, 497 F.2d 1092 (7th Cir.1974), noting that non-contemporaneous evidence may properly show the extent of the claimant's condition, even though the evidence was obtained several years after the actual onset of the impairment given the nature of the impairment. *Id.* at 1004. The Court in *Ray* noted that the ALJ and the Secretary have the ultimate obligation to develop the file to discern, as of the requested onset time and as of any last insured date, the degree and severity of the claimant's condition. *Ray*, 843 F.2d at 1006. The Court determined that projective psychiatric and psychological testimony was proper and should have been obtained to discharge the Secretary's obligation to fully and completely develop the file and fully and completely consider all of the evidence. *Id.* at 1006–07.

The Secretary, in response, asserts that a claimant bears the burden of demonstrating that he had a significant impairment during the relevant period which precluded his return to prior employment. 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1512; *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir.1984); *McNeil v. Califano*, 614 F.2d 142 (7th Cir.1980).

■ This Court agrees that the claimant has that burden; however, the issue in this case is not whether the claimant has met his burden, but whether the Secretary and ALJ developed the record in such a way that the Plaintiff was fairly given an opportunity to carry his burden.

■ Next, the Secretary claims that the Plaintiff has failed to provide any medical evidence as to his condition from the date when he first alleged that he became disabled (December 2, 1980) through the March 31, 1984, expiration of his disability insured status.

In *Ray*, there was admittedly no contemporaneous psychological evidence of the claimant's mental state during the covered period which would serve as a baseline for assuring the reliability of a retrospective psychological examination. *Id.* at 1007. However, the Court, under the particular circumstances in the *Ray* case puts an affirmative duty on the ALJ and Secretary to develop the record and project whether or not the claimant was disabled as of the time that the claimant's insured status expired when it has acceptable medical evidence to establish an impairment as of that time. *Id.* at 1004–07. The Court in *Ray* appeared to believe that acceptable medical evidence on the issue of alcoholism could be projected back in time as alcoholism follows a pattern of readily definable and medically determinable developmental stages. *Id.* at 1004–05.

The Secretary contends that the *Ray* case is distinguishable because evidence of the Plaintiff's medical condition during this

833 F.2d 650, 652 n. 1 (7th Cir.1987); *Jeralds v. Richardson*, 445 F.2d 36, 38–39 (7th Cir.1971). Medical evidence is deemed to be the primary element in determining the onset of disability,

and the date so determined can never be inconsistent with the medical evidence of the record. Social Security Ruling 83–20.

covered period was offered by the claimant in the form of three reports by the Plaintiff's alcoholism counselors. The Secretary asserts that the plaintiff in the *Ray* case suffered from severe and progressive alcoholism during the covered period; however, these reports were largely ignored by the ALJ and the Appeals Council in that case when they denied benefits based upon an alleged absence of documentation of the alcoholism prior to the expiration of the Plaintiff's insured status. *Id.* at 1103–04.

This Court notes that, in this case, the Plaintiff has offered substantial evidence of his alcoholism. Mary Brown testified that the claimant over a period of years became more incapable of taking care of himself because of his alcoholism. (AR 218–219). She stated that she did not believe that the Plaintiff had been able to work due to his drinking and other problems for well over ten years. (AR 219). Dr. Hurd stated that the Plaintiff had a history of alcoholism over a period of years which remained a problem for him in his report of September 29, 1986. (AR 186). The psychiatric evaluation of Dr. Brady reported that the Plaintiff was currently dependent on alcohol and noted that he had some history of drinking. (AR 189–192) (October 8, 1986). Prior records from the Memphis Clinic from February 18, 1975 indicate that the Plaintiff drank three to four fifths of wine a day. (AR 164). Also, the report from the Memphis hospital in February of 1976 indicated that the Plaintiff had chronic alcoholism. (AR 171). The Plaintiff was admitted to the Tennessee Psychiatric Hospital and Institute for Alcohol and Drugs on March 16, 1976, treated for alcohol addiction, and then discharged on March 26, 1976. (AR 176). Dr. Adler reported that the Plaintiff had been a habitual alcohol user over a long period of time which very well could have precipitated alcoholic blackouts and convulsions in his report of April 27, 1977. (AR 180).

Even further, the Court notes that the ALJ found that the Plaintiff met the listing of 12.09 for the Plaintiff's chronic alcohol abuse as of September 5, 1986. (AR 16). The ALJ further found that the Plaintiff had been diagnosed as having organic brain syndrome which was the equivalent of 12.02 of the listings. (AR 16).

The Secretary contends that the evidence before 1980 only indicates a combination of several non-severe impairments, including a seizure disorder which was controlled by medication. While the Court notes that it appears that the Plaintiff's major problem before 1980 was a seizure disorder, there is a fair amount of evidence indicating that the Plaintiff had problems with chronic alcoholism and that the problems with chronic alcoholism may have caused the seizure disorder.

The Secretary asserts that in an effort to more fully develop the virtually non-existent medical record provided by the Plaintiff after 1979, the Plaintiff was examined at government expense by three consultive examiners: Dr. Hurd on September 29, 1986 (AR 186–188), Dr. Brady on October 8, 1986 (AR 189–193), and Dr. Weimer on August 6, 1987 (AR 225–230). The Secretary argues that the results of these examinations are fully consistent with the earlier medical evidence providing no basis for an inference that the Plaintiff was disabled prior to the expiration of his insured status in March of 1984.

This Court makes the following observations about these reports. First, the ALJ relied on these reports to find the Plaintiff disabled after 1986. Second, the ALJ based its decision that the Plaintiff was not disabled in March of 1984 (when the Plaintiff's insured status expired) on the fact that there was no medical evidence in the claimant's file from March 5, 1979 to September 29, 1986. The ALJ did not find that the Plaintiff was not disabled in March of 1984 because of these three reports but rather because of lack of evidence. Also, after examining these reports, it is clear that these doctors did not make projections as to whether the claimant was disabled as of March of 1984. The reports of these three doctors only discussed whether the Plaintiff was currently disabled.

■ This Court does not intend to impose a blanket requirement for retrospective consultive examinations as a means of

remedying a Plaintiff's failure to submit the required medical evidence of disability. However, (1) where the Plaintiff specifically requests that the Secretary obtain retrospective consulting examinations, (2) where the Plaintiff suffers from a precisely diagnosable impairment such as alcoholism or scleroderma as in *Stark*, 497 F.2d 1092, which has well-known developmental stages and follows a pattern of readily definable and medically determinable developmental stages, (3) where there is at least a fair amount of evidence from the Plaintiff's history indicating a pattern of readily definable and medically determinable developmental stages, and (4) where, as in *Ray*, the Secretary fails to adequately develop the record in the first place, the Secretary or ALJ has a duty to develop the record. *See, Ray*, 843 F.2d at 1005, 1006–1007.

In this case, it is clear from the Court's earlier discussion that the Plaintiff has satisfied the first three parts of the above test. The only question remaining is whether the Plaintiff has satisfied the fourth requirement. The *Ray* case involved a claimant who had applied for disability insurance benefits almost five years before the expiration of his insured status (he filed for disability insurance benefits on January 23, 1976 and his insured status ran out on December 31, 1981). *Id.* at 999–1000, n. 3. At the first hearing in the *Ray* case, the ALJ ignored substantial evidence of Ray's alcoholism in ruling that he was not entitled to benefits. *Id.* at 1007. The case sat waiting review in the Northern District of Indiana for six years. *Id.* By the time the case was remanded years later, the ALJ determined a psychological examination would no longer be relevant. *Id.* The Seventh Circuit determined that, where it was the Secretary's fault in failing to have adduced contemporaneous medical/psychological evidence, the Secretary was required to direct the ALJ to order a psychological examination of the claimant to determine whether he was disabled during the covered period. *Id.*

In this case, Plaintiff filed his application for disability insurance benefits on September 3, 1986. The Plaintiff satisfied the insured status requirements of the Act only through March 1, 1984. In this case, the Plaintiff filed this action over two years after his insured status expired. As noted earlier, the claimant in the *Ray* case applied for disability insurance benefits almost five years before the expiration of his insured status.

The court in *Ray* stated two factual bases for requiring further development of the record. The court stated:

> As Ray points out in his brief, this absence of contemporaneous medical evidence is attributable to both the nature of the disease (alcoholics refuse to seek treatment because they refuse to admit they are alcoholics), and, more importantly, to the failure of the Secretary to adequately develop the record in the first place.

*Id.* at 1007.

In this case, there is certainly enough evidence of alcoholism to suggest that the absence of contemporaneous medical evidence is attributable to the Plaintiff's alcoholism problem.

The more important question is whether the Secretary's failure to adequately develop the record was the cause of a lack of "contemporaneous" evidence. In one sense, the Secretary could not have developed "contemporaneous" evidence because the Plaintiff in this case filed his action two years after his insured status expired. However, this Court believes that a definition of "contemporaneous" evidence which is that narrow would be improper. This Court believes that "contemporaneous" evidence should be defined as evidence adduced at the time that the Plaintiff brings his case before the ALJ or Secretary. This would include "contemporaneous" evidence which would project the condition of the Plaintiff at the time his insured status expired or evidence of his condition at that time.

One could argue that this would require the Secretary to adduce evidence many years after the Plaintiff's insured status has expired. This simply is not correct because the Plaintiff must meet the first three parts of the test given earlier in this

case which require the Plaintiff to request retrospective consulting examinations, to prove he suffers from a precisely diagnosable impairment, and to adduce evidence of a history of a pattern of readily definable and medically determinable developmental stages. At some point the passage of time undermines the Plaintiff's ability to satisfy this test.

Because the Plaintiff presented substantial evidence of his alcoholism and because the Secretary failed to adequately develop the record regarding the Plaintiff's condition at the time that his insured status expired, this court remands the case to the Secretary for further development of the record. The Secretary is directed to order a psychological examination of the Plaintiff to determine whether the Plaintiff was disabled during the covered period.

B. *Whether the Secretary Should Have Required Expert Vocational Testimony to Determine Whether the Claimant Could Return to His Past Relevant Work*

The ALJ, in his decision, acknowledges that as of September 3, 1986, the Plaintiff had a condition which meets listings 12.09 and 12.02 as having chronic alcoholism with organic brain syndrome. He also acknowledges that prior to September 3, 1986, the Plaintiff had a seizure disorder which precluded his ability to work around machinery or moving vehicles. (AR 15). The Plaintiff contends that these limitations preclude truck driving, and coupled with the finding of organic mental damage and borderline mental functioning as noted by Dr. Hurd (AR 186), required vocational testimony to discern whether the Plaintiff maintained both the physical and mental abilities to perform his past relevant work.

The Secretary concedes that testimony is indeed required where non-exertional impairments significantly limit a claimant's performance level of the full range of work at a designated exertional level, *Warmoth v. Bowen*, 798 F.2d 1109 (7th Cir.1986); *Nelson v. Secretary of Health and Human Services*, 770 F.2d 682 (7th Cir.1985). However, the Secretary notes that the only non-exertional restrictions noted in this case are environmental in nature, i.e., an inability to work around heights or moving machinery. In the context of exertional capacity for heavy work, the medical vocational guidelines provide specifically that such environmental restrictions do not, in general, significantly reduce a claimant's available employment base. *See*, 20 C.F.R. Part 404, Subpart P, Appendix 2, § 204.00.

In determining whether non-exertional impairments required the Secretary to obtain vocational or other evidence, the court stated in *Warmoth v. Bowen*, 798 F.2d 1109, 1110 (7th Cir.1986):

Application of the grid is precluded, however, in cases where a claimant's non-exertional limitation restricts the full range of employment opportunity at the level of work that he is physically capable of performing; in such cases, resolution of the issue generally will require consultation of occupational reference materials (see 20 C.F.R. § 404.1566(d) (1985)) or the services of a vocational expert. (Citation omitted).

In this case, at present, there is insufficient evidence in the record to indicate that there was a non-exertional impairment as of the time that the Plaintiff's insured status expired. However, this Court is remanding the case to the Secretary for further development of the record to determine whether the Plaintiff had a mental impairment as of the expiration of his insured status. After further developing the record, the Secretary should determine whether or not the Plaintiff's non-exertional mental limitation restricts the full range of his employment opportunities at the level of work that he is physically capable of performing. Of course, if the Secretary answers that question in the affirmative, the Secretary must consider occupational reference material or use the services of a vocational expert to determine whether the Plaintiff could return to his past relevant work.

CONCLUSION

This Court GRANTS the Plaintiff's Motion for Summary Reversal (# 9–1) and DE-

NIES the Defendant's Motion for Summary Affirmance (# 17–1). The Court REVERSES and REMANDS the decision of the Secretary and orders that further action be taken in accordance with the findings of this opinion.