**Joe D. LLOYD, Plaintiff,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant.**

No. 94 C 1403.

United States District Court, N.D. Illinois, Eastern Division.

Feb. 22, 1995.

Craig Ledford, Law Offices of Craig Ledford, Chicago, IL, Kenneth F. Laritz, Atty., Warren, MI, for plaintiff.

Michele Szary Schroeder, Steve Mason, U.S. Attorney's Office, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Pursuant to 42 U.S.C. § 405(g), Joe D. Lloyd ("Lloyd") appeals the final decision of the Department of Health and Human Services Secretary Donna Shalala ("Secretary") denying Lloyd's claim for Disability Insurance Benefits ("DIB") under the Social Security Act, 42 U.S.C. §§ 416(i), 423. Both parties move for summary judgment under Federal Rule of Civil Procedure 56.

## BACKGROUND

We begin with a brief overview of the present case and then review the evidentiary

record in detail. Lloyd is a 55 year old male who alleges that he became disabled on March 14, 1979, due to arthritis of the spine, and whose insured status expired on September 30, 1986.[1] (R. 167, 180) The onset of Lloyd's injuries appears to date back, at least, to an accident in 1978 at the Ford Motor Company ("Ford"), where he was employed at the time.[2] (R. 107–108, 123–124, 360) On April 29, 1978, Lloyd was admitted to Northwestern Memorial Hospital complaining of a history of low back pain that was aggravated two weeks previously at his work. (R. 221) At the time, Lloyd reported a two to three year history of low back pain. He was discharged a little more than a week later, after his symptoms subsided following a regimen of bedrest, traction and local heat. (*Id.*) Although Lloyd initially evidenced a positive straight leg raise bilaterally, at discharge he was able to straight leg raise to 90 degrees without difficulty and was walking without assistance. (*Id.*) An x-ray of the spine revealed an "essentially normal appearing lumbar spine," *id.*, with the disc spaces well preserved and no significant evidence of arthritis, fractures or destructive lesions. (R. 218)

In 1979 Lloyd retired from Ford due to his back pain and has not worked since to any significant extent.[3] (R. 123–125). On August 14, 1984, Lloyd was again admitted to a hospital with lower back pain, and was discharged after improving somewhat following physiotherapy. (R. 245–46) In February 1990, Lloyd began outpatient physical therapy for his back pain, but after sporadic attendance his therapy was discontinued. (R. 322–330) In connection with his present application for benefits, Lloyd began a series of four or five consultations with a psychologist (Dr. Antia) in May 1992, who subsequently opined that Lloyd was disabled from work due to his pain and psychoneurological impairments. (R. 355–60)

Over the years since Lloyd's initial complaints in 1978, Lloyd consulted a number of physicians who have generally opined that Lloyd was suffering from a variety of back maladies. There has been no consensus on Lloyd's diagnosis, *see, e.g.*, R. 224 (Dr. Oh—lumbar-sacral muscle sprain); R. 234 (Dr. Rabinowitz—Chronic low back syndrome); R. 241 (Dr. Domoto—status post trauma of the lumbar spine); R. 335 (Dr. Brown—chronic low back strain with right sided sciatica); R. 316 (Dr. Gerhold—osteoarthritis lower back, back pain), and, as will be discussed below, diagnostic assessments including x-ray, CT scan, and myelogram have consistently revealed an essentially normal spine. Almost without exception, the physicians that Lloyd consulted indicated that he could return to light or sedentary work; and, those who concluded that Lloyd was unable to return to *any* work did so many years

---

1. Lloyd previously applied for DIB on July 21, 1978, April 30, 1980, and July 15, 1981. (R. 10–11) All three of these applications were denied initially (on October 19, 1978, July 2, 1980, and September 9, 1981, respectively), and not appealed further. (Id.) With respect to Lloyd's present application—filed October 10, 1989, the Appeals Council found that no new and material evidence existed with respect to the period through July 2, 1980, and therefore concluded that the doctrine of *res judicata* barred Lloyd's claims through that date. (R. 11) Before this Court, Lloyd concedes that *res judicata* bars his claims for the period preceding July 2, 1980. Lloyd now claims an onset date for his disability of August 1984. Pl.'s Mot.Summ.J. at 4. After filing the present application for disability benefits and after the ALJ had issued his opinion, Lloyd alleged that he is and was disabled due to a mental impairment (depression) (R. 434–435)—first raising this argument before the Appeals Council.

2. There appears to be some confusion in the record about the date and nature of Lloyd's acci-

dent(s) at Ford. *Compare* Lloyd's own testimony (hit by a lift truck at Ford in 1979) (R. 123–124); Dr. Rabinowitz' report (hit by a truck in 1977 and another, unidentified trauma at Ford in 1979) (R. 233); Dr. Domoto's report (hit by a lift truck at Ford in 1978 and reinjured in 1979 while lifting 50 pounds) (R. 239); Dr. Antia's report (hit by a lift truck at Ford in 1978) (R. 356); Dr. Gerhold's report (onset of joint disease in 1979 after accident) (R. 251, 255); and the report from Northwestern Memorial Hospital where Lloyd was admitted April 29, 1978 (low back pain aggravated by lifting at work two weeks prior to admission) (R. 211, 212).

3. There is conflicting evidence in the record regarding Lloyd's post–1979 employment history. During his hearing before the ALJ, Lloyd testified that he last worked in March of 1979. (R. 123) However, Lloyd's earning record reflects earnings of $342, $2,552.81, and $922.74 in 1981, 1984, and 1985, respectively. (R. 183) The ALJ did not explore this discrepancy in the evidence.

after Lloyd's date last insured of September 30, 1986, *see, e.g.* R. 316 (Dr. Gerhold—3/11/91); R. 470 (Dr. Antia—7/17/92).

Following a hearing on March 20, 1991, an Administrative Law Judge ("ALJ") issued a decision denying Lloyd's claim for disability benefits. (R. 102–113) The Appeals Council affirmed in part and modified in part the ALJ's decision. Specifically, the Appeals Council affirmed the ALJ's determination that Lloyd was not disabled on or before September 30, 1986; however, the Appeals Council modified the ALJ's findings by rejecting the ALJ's enumerated finding number 4 that Lloyd's residual functional capacity to perform the full range of sedentary work was reduced by back pain. The Appeals Council found this finding to be inconsistent with the ALJ's discussion in the narrative portion of his decision and inconsistent with the ALJ's enumerated findings numbers 4 and 5. Accordingly, the Appeals Council found that "[t]he evidentiary record, as set forth by the Administrative Law Judge, amply demonstrates that as of September 30, 1986, the claimant retained the functional capacity to perform the full range of sedentary work." (R. 11) The Appeals Council explicitly considered the evidence submitted following the ALJ's decision was issued concerning Lloyd's mental impairment and reached its finding of "not disabled" in light of both the evidence presented to the ALJ and the psychological report. (R. 7–13) The Court now turns to its review of the pertinent testimony and medical evidence in the record.

*Lloyd's Hearing Testimony*

For ease of exposition in the following summary of Lloyd's testimony, the Court shall, for the most part, dispense with the use of qualifying expressions such as "Lloyd reported", "Lloyd testified", and "Lloyd stated". Nevertheless, it should be understood that the Court is merely recounting Lloyd's testimony here, not stating findings of fact.

Lloyd retired from Ford—where he performed heavy work loading machines and being on his feet all day—in 1979, due to back pain which developed after being struck by a lift truck at work. (R. 123–124) He tried to do lighter work at Ford, but was unable to do it because it aggravated the pain in his back. (R. 125)

Lloyd complains of pain in his lower back and right leg, which has remained the same since the date of his injury. (R. 148) Cold and damp weather, bending, sitting, standing, and walking aggravate his pain. (R. 149–150, 152) Lloyd testified that he could not sit or stand for more than 15 or 20 minutes, (R. 153), and he indicated that sitting for the duration of the hearing aggravated the pain in his back. (R. 158) Lloyd also stated that when he goes to church—approximately once per month, he has to get up and move around after 15 or 20 minutes of sitting. (R. 135) Walking, even as little as ten steps aggravates his pain. (R. 151) He has no numbness. (R. 152) Although he is fully capable of lifting a cup of coffee, Lloyd will not lift anything over five to ten pounds. (R. 152–53)

Lloyd generally gets up between 10:00 and 11:00 a.m. and spends most of his day around his house, alternating between sitting, walking, and going to bed. (R. 133) If there is food in the house he eats breakfast in, otherwise, he drives to a restaurant. (*Id.*) However, he drives as little as possible because getting in and out of the car is difficult. (R. 162) Although he eats two to three meals per day, Lloyd does not cook; therefore, he either eats out at a restaurant or prepares a cold meal such as a sandwich for himself. (R. 133) He eats out most of the time. (R. 137) Lloyd has a "good appetite" and enjoys his food. (R. 135)

Lloyd has no hobbies although he has belonged to a health club for approximately five or six years. He tries to go to the club at least two to three times per week and when he does, he sits in the steam or the whirlpool; he does not exercise. (R. 134)

Around the house, Lloyd does light housework such as washing dishes and dusting; however, his son, with whom he lives, does the more substantial tasks such as taking out the garbage, doing the laundry and cutting the grass. (R. 136–37) Lloyd also does light grocery shopping, such as picking up "little odds and ends ... maybe milk and bread and maybe some lunchmeat ... just to have

something in the house to eat." *(Id.)* · Lloyd is capable of taking care of his personal needs such as washing and dressing himself—although he has trouble bending over to put on his shoes and pants. (R. 136)

When asked about medication, Lloyd testified that he was taking Equigesic two or three times a week but since they were making him dizzy and drowsy, he discontinued taking them regularly. He now takes equigesic only "now and then." (R. 140–141) Lloyd· also stated that sometimes Equigesic helped him, whereas on other occasions it did not provide relief. *(Id.)* Lloyd was previously prescribed Tylenol III; however, it has been a couple of years since he has taken this drug. (R. 140) Lloyd also testified that he had been prescribed Darvocet at some point in time before the Tylenol III was prescribed but it did not seem to help. (R. 160)

Lloyd goes to Dr. Gerhold for "prescriptions" authorizing outpatient physical therapy at Ingalls hospital. Lloyd indicated that he would go to physical therapy when his back was causing a lot of pain. When asked how many times he went to physical therapy in the past five years, Lloyd responded: "Maybe twice." (R. 144) Later, Lloyd indicated that he received physical therapy at Ingalls in February of 1990. (R. 155) Finally, Lloyd stated that he had also seen a chiropractor six or seven years. before the hearing, for about two to three weeks, and that the treatment seemed to have helped at the time. (R. 145)

When asked if there was anything else troubling him that was not explored during the hearing, Lloyd responded, "No". (R. 156–57) Lloyd's non-attorney advocate questioned him concerning the emotional effects of his inability to work. In response, Lloyd seemed to focus on the financial consequences of his inability to work, noting, "the more money you can make[,] you can do more for yourself.. I don't have the money to do things for myself." (R. 162) When asked if there were any effects on how he felt about himself other than financial effects, Lloyd responded, "if you [are] living poorly

your friends look down on you. Like you aint nothing or something like that....." (R. 162–63)

When Lloyd was asked why he waited so long to reapply for benefits after his disallowances in the early 1980s, Lloyd responded "I couldn't [ ] say." (R. 147) And, when asked why he did not appeal his earlier disallowances, Lloyd indicated that he was aware of his right to appeal and stated that he did not know why he did not. (R. 163)

*Lloyd's Medical Records*

1. *Northwestern Memorial Hospital Records* (R. 211–221)

On April 29, 1978, Lloyd was admitted to Northwestern Memorial Hospital with a history of low back pain, aggravated at work two weeks prior to admission. (R. 221) Lloyd's physical examination was within normal limits, except his straight leg raise was positive bilaterally with cross-over on the left side. Faber's test was positive. *(Id.)* X-ray revealed an essentially normal-appearing lumbar spine. *(Id.)* Lloyd was treated with bedrest, traction, and local heat, to which he responded excellently. *(Id.)* At the time of his discharge on May 9, 1978, Lloyd was able to straight leg raise to 90 degrees without difficulty and walk without any assistance. · *(Id.)*

2. *Dr. Gerhold Reports* [4]

A. Attending Physicians Statement (R. 225–29)

Dr. Gerhold completed several "attending physician statements" concerning Lloyd in connection with his extended disability benefits program offered through Ford. The statements bear dates between March 11, 1980, and August 22, 1984. (R. 225–229)

In the February 11, 1980 report—which was completed approximately one-month after Lloyd's most recent visit, Dr. Gerhold noted a diagnosis of "low back pain, probable slipped disk; lumbo-sacral strain; absent right knee jerk. (R. 226) The statement provides a date of March 16, 1979 as the date

---

**4.** Dr. Gerhold has been Lloyd's treating physician since at least 1975. (R. 186, 225, 227, 294). From various entry dates in Dr. Gerhold's records, it appears that Gerhold may have been seeing Lloyd since the mid–1960's. (R. 301–03)

of first treatment for Lloyd's injury and further states that Lloyd has been continuously disabled from March 13, 1979 through the date of the statement. The time frame of Lloyd's disability is stated to be indefinite. (*Id.*) In the March 11, 1980 [5] report, Gerhold again noted a diagnosis of "Low Back pain; probable slipped disk; Lumbo sacral strain; Absent Rt. knee jerk" and characterized Lloyd's condition as "unimproved." (R. 225).[6] Gerhold further indicated that Lloyd was "totally" disabled and that he had been continuously disabled since February 7, 1979. Again, the time frame of Lloyd's disability is stated to be indefinite. (*Id.*) The diagnostic impression reported in the October 2, 1980 statement remained the same as in the previous statements. (R. 227) Gerhold again reported that Lloyd was unimproved and suffering from a total disability, of an indefinite character since February 8, 1979. (*Id.*) Gerhold's statement of March 9, 1982 [7], is essentially the same, again indicating that Lloyd was totally disabled for an indefinite period of time with the onset of his disability being on March 13, 1979. (R. 228) In the August 22, 1984 statement, Dr. Gerhold provided a diagnosis of osteoarthritis of the lower spine. (R. 229) The date of first treatment after last day worked is reported as August 7, 1984. (*Id.*) Dr. Gerhold reported that Lloyd was continuously disabled from August 7, 1984, and that his disability was indefinite. (*Id.*) Finally, on March 11, 1991, Gerhold completed an Attending Physician's Report declaring Lloyd permanently disabled since March of 1979 with a diagnosis of osteoarthritis of the lower back. (R. 316)

## B. Report and Physical Capacities Evaluation

On May 22, 1980, Gerhold completed a report on Lloyd at the request of State of Illinois Disability Determination Services in connection with Lloyd's application for benefits. (R. 230–232) Gerhold's most recent examination of Lloyd was approximately two months earlier. Gerhold provided a diagnosis of lower back pain and probable slipped disk (R. 230) Gerhold noted that Lloyd's gait and reflexes were normal, that Lloyd ambulated without assistance, and that there was no atrophy or sensory loss. (R. 230) Gerhold also noted that Lloyd reported back pain radiating into the right leg. (*Id.*) Range of motion of the cervical spine was normal. With respect to flexion, range of motion of the lumbo-sacral spine was somewhat limited; extension of the lumbosacral spine was normal. (R. 231) Lloyd reported that straight leg raising was painful bilaterally. (*Id.*) On the physical capacities evaluation accompanying the spinal disorders report, Gerhold reported that Lloyd could perform sedentary work,[8] bend and stoop occasionally, and climb and operate foot controls frequently. (R. 232)

## C. Admission, Progress and Discharge Summary (R. Ex. 22)

On August 14, 1984, Lloyd was admitted by Gerhold to St. Francis Hospital ("St. Francis") for treatment and evaluation of back pain radiating down into the right leg. (R. 244–46) Dr. Gerhold reported that Lloyd's physical examination was essentially normal. (R. 246) A complete pre-admission diagnostic work-up—including a CT scan and myelogram—was conducted at St. James Hospital. (R. 245) Gerhold reported that there was "some facet arthropathy at L5–S1 which was shown by the CAT scan. However, there was no nerve root displacement." (R. 246) [9] X-ray of the spine revealed slight

---

5. This statement is not dated by Dr. Gerhold, but it bears a notation indicating that it was received on March 11, 1980.

6. Inexplicably, in the March 11, 1980 statement, Gerhold indicates that the date of first visit was February 7, 1979 (as opposed to March 16, 1979, as is indicated on the February 11, 1980 statement).

7. At the time of the March 9, 1982 report, Gerhold had not seen Lloyd for approximately five months.

8. Sedentary work was defined as being able to lift/carry small objects—up to ten pounds—occasionally, standing/walking occasionally (with adequate rest periods), and sitting for up to six hours (with adequate rest periods).

9. The CAT scan report noted the "slight hypertrophy of the facets at L5–S1 bilaterally.... [h]owever, the nerve root showed no definite displacement or extrinsic pressure." (R. 249) Also, there was no sign of spinal stenosis. (*Id.*) A radioisotope report also noted that "with spe-

levoscoliosis of the lower lumbar vertebrae. (*Id.*) The radiology report noted that "the disc spaces and vertebral heights ... are well maintained" and that "there is no evidence of significant bone or joint abnormality." (R. 247) In the discharge summary, Gerhold reported that Lloyd improved somewhat after receiving physiotherapy, and Gerhold suggested that Lloyd should be on an anti-inflammatory drug like Motrin. (*Id.*)

D. Arthritic Report & Spinal Disorders Report (R. 251–54 [Ex. 23] ) [10]

On January 26, 1990, Gerhold completed an Arthritic Report and a Spinal Disorders Report for the Illinois Bureau of Disability Determination Services—apparently in connection with Lloyd's present application for benefits. (R. 251–54) Gerhold provided a diagnosis of lower back pain with an onset in 1979 due to an accident. (R. 251) Gerhold reported that there are no structural changes—such as bone hypertrophy, bone destruction or anatomical deformities—in Lloyd's spine, and that there is no atrophy, inflammation, sensory loss, manipulative limitation [11], or functional abnormalities such as weakness. (R. 251–53). Although Lloyd walked with a slight limp, a cane or other assistive device was not required. (R. 252–53) Gerhold did report some limitation in Lloyd's range of motion of the lumbo-sacral spine and noted that Lloyd reports back pain when lifting, bending or walking. (*Id.*) Additionally, Gerhold reported that Lloyd's straight leg raise was positive bilaterally. (R. 254)

E. Physical Capacities Evaluation and Pain Questionnaire (R. Ex 35)

Approximately one year after completing the Arthritic Report and Spinal Disorders Report just discussed, Gerhold completed a Physical Capacities Evaluation (CPE) and a Pain Questionnaire for Lloyd in connection

with his application for benefits. (R. 310–11) In the CPE, Gerhold opined that Lloyd could sit, stand and walk for only 5 to 10 minutes at one time during an 8–hour workday. (R. 310) In total, during an eight hour work day, Gerhold opined that Lloyd could sit for two hours, stand for one to two hours, and walk for two hours. (*Id.*) Gerhold reported that Lloyd could never lift more than five pounds—although he could lift five pounds frequently, and that while Lloyd could occasionally carry up to 10 pounds, he could never carry more than that. (*Id.*) Gerhold also reported that Lloyd could use both of his hands for simple grasping, pushing and pulling of arm controls, and fine manipulation, but that he could not use either of his feet, separately or in tandem, for repetitive movements such as in pushing and pulling of leg controls. (*Id.*) Gerhold reported that Lloyd could bend, climb and reach occasionally, but that he could not squat or crawl. (*Id.*) In the section of the report dealing with restriction of activities, Dr. Gerhold noted that Lloyd has a mild restriction for driving automotive equipment and exposure to dust, fumes and gases, and has a total restriction for unprotected heights, being around moving machinery, and exposure to marked changes in temperature and humidity. (*Id.*) Finally, Dr. Gerhold noted that since approximately 1979 Lloyd has needed to lay down intermittently for pain relief, that the pain level that Lloyd suffers from is moderately severe, *i.e.*, it seriously affects the ability to function, and that this pain level is consistent with his diagnosis and objective findings. (R. 310–311).

3. *Dr. Oh Report*

Dr. Oh, an associate of Dr. Gerhold, saw Lloyd on July 18, August 1, and August 18, 1978. (R. 223) Lloyd came to see Dr. Oh because of low back pain radiating to both thighs. (*Id.*) An initial examination revealed a limited range of motion: straight leg

---

cial attention to the lumbar spine no definite abnormality is seen." (R. 250).

10. Exhibit 24 (R. 255–58) is essentially a copy of Exhibit 23 (R. 251–54) done by someone in Dr. Gerhold's office to make it more legible. Exhibit 23 is the original and is signed by Gerhold. Exhibit 24 bears a stamp of Gerhold's signature.

11. Gerhold inadvertently indicated the presence of manipulative limitations; however, investigation by the adjudicator assigned to Lloyd's case revealed that this was an error and that Lloyd had no manipulative limitations. (R. 259).

raising was 40 and 30 degrees on the right and left sides respectively. (*Id.*) During the August 1 visit, Lloyd reported that his symptoms had improved and straight leg raising improved to 70 and 80 degrees on the right and left sides respectively. (*Id.*) Lloyd's right knee jerk was 1 + and his left knee jerk was 2 +. Dr. Oh advised Lloyd to have physical therapy, but Lloyd refused. (*Id.*) During the August 15 visit, Lloyd stated that he had no more back pain. Straight leg raising was negative and Lloyd was ambulating without a limp. Lloyd was advised to start light duty work and to return in two weeks for an evaluation. (*Id.*) Lloyd did not return for the evaluation. (R. 224) Dr. Oh diagnosed Lloyd with a strain of lumbar sacral spine muscles, but indicated a need to rule out compressive lumbar radiculitis. (R. 224)

### 4. Dr. Rabinowitz Reports

#### A. Disability Examination

On May 24, 1980 Dr. Rabinowitz examined Lloyd at the request of the State of Illinois Disability Determination Services in connection with an application for disability benefits. (R. 233) Rabinowitz noted that Lloyd presented with a history of low back pain located in the low lumbar area and radiating to both legs, which is aggravated by bending, lifting, stooping, and climbing. (*Id.*) Rabinowitz also noted Lloyd's report that he could not lift more than five or ten pounds because of severe pain. (*Id.*) With respect to Lloyd's mental status, Rabinowitz reported that he "appear[ed] to be oriented to time, place and person." No psychological impairment was noted. (*Id.*) Rabinowitz' examination of Lloyd's musculoskeletal system revealed a "full range of motion in all the joints without joint tenderness, effusions, atrophy or redness, except for the lumbar spine, where there is 70 degrees of flexion, 10 degrees of extension, 10 degrees of right lateral flexion and 10 degrees of left lateral flexion. Motion was associated with pain. (R. 234) Rabinowitz reported that straight leg raising was negative bilaterally, Lloyd's gait was

normal and he ambulated without an assistive device. (*Id.*) Rabinowitz observed that Lloyd had no difficulty getting onto and off of the examining table and there was no difficulty with squatting and arising from the sitting position. (R. 235) X-ray revealed hypertrophy of the facet joints of the lower lumbar spine. (*Id.*) Disc spaces and vertebral body heights were normal. (*Id.*)

Rabinowitz summarized by noting that Lloyd has a "significant loss of motion of the low lumbar spine associated with considerable pain, but no findings directing one to a neurological problem." Rabinowitz' diagnostic impression was "chronic low back syndrome." (*Id.*) Rabinowitz noted that Lloyd was currently taking no medications. (R. 233)

#### B. Physical Capacities Evaluation

On May 25, 1980, Rabinowitz completed a Physical Capacities Evaluation of Lloyd for the Bureau of Disability Adjudication Services. (R. 236) Rabinowitz reported that Lloyd was capable of medium work,[12] and could frequently climb, bend, stoop, and operate foot controls. (R. 236) No other limitations were noted.

### 5. Dr. Domoto Report

On August 8, 1981, Dr. Domoto examined Lloyd at the request of the State of Illinois Disability Determination Services in connection with Lloyd's application for disability benefits. (R. 239–241) Domoto related Lloyd's complaints of a history of back pain radiating into his right leg—aggravated by lifting. (R. 239) Domoto noted that Lloyd was oriented to time, place and person. (*Id.*) Domoto reported that Lloyd had a full range of motion of all the joints, with the exception of the lumbar spine. (R. 240) In the lumbar spine, 90 degrees of flexion, 20 degrees of extension, 20 degrees of right lateral flexion and 20 degrees of left lateral flexion were observed. (*Id.*) In summary, Domoto stated that Lloyd suffers from severe pain in the low lumbar spine, but that the examination revealed only a mild loss of motion and no

---

**12.** Medium work was defined as being able to lift/carry 25 pounds frequently and 50 pounds occasionally, standing/walking for at least six hours (with adequate rest periods), and sitting without any limitations (with adequate rest periods).

reflex, sensory or motor findings suggesting nerve root impingement. (R. 241) Domoto also noted that Lloyd took no medication for his pain. (*Id.*)

## 6. *Records from the St. Francis Hospital*

See Section 1.C. *supra.*

## 7. *Dr. Patey Report*

On February 8, 1990, Dr. Patey completed a current Residual Physical Functional Capacity Assessment ("RPFC") for Lloyd in connection with his application for benefits. (R. 260–267). Patey reported that Lloyd could lift and/or carry fifty pounds occasionally, frequently lift and/or carry twenty five pounds, stand and/or walk (with normal breaks) for about 6 hours in an eight-hour workday, sit (with normal breaks) for about 6 hours in an 8–hour workday, and that Lloyd's ability to push and/or pull is unlimited, including the operation of hand and/or foot controls. (R. 261). Patey noted that Lloyd's leg raising, both straight and bent, was painful at 30 degrees on the left, and 60 degrees on the right. (*Id.*) However, Patey noted that "[Lloyd's] back movements are quite good. One would not expect pain to limit function more than noted." (R. 265). Patey found no postural or environmental limitations for Lloyd. (R. 262–264)

## 8. *Dr. Gonzalez Report*

On May 15, 1990, Dr. Gonzalez completed a retrospective RPFC for Lloyd's date last insured of September 30, 1986. (R. 268–275) Gonzalez opined that Lloyd could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty five pounds, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8–hour day, and that Lloyd had an unlimited ability to push and/or pull, including the operation of hand and/or foot controls. (R. 269) Gonzalez found no postural or environmental limitations for Lloyd. (R. 270–272) Gonzalez observed no muscle atrophy and noted that Lloyd's ambulation was normal with slight limping.

## 9. *Physical Therapy Notes from Ingalls Memorial Hospital*

Lloyd was referred for physical therapy by Dr. Gerhold to Ingalls Memorial Hospital as an outpatient, where he underwent an initial evaluation on February 1, 1990.[13] The report from the initial evaluation related Lloyd's complaints of pain in the right lumbosacral region with radiation into the right buttock and posterior aspect of the right thigh. (R. 330) Furthermore, the report stated that Lloyd reported that his pain is fairly constant, and that it increases with prolonged standing or sitting, and decreases when he lies down on something firm. (*Id.*) The report further notes that Lloyd complained of pain when the straight leg raise test was initiated, and that Lloyd could not be positioned for a FABER test because he complained of "too much pain." (*Id.*) The overall assessment of Lloyd was "pain in the right lumbosacral region with radiation in to the right posterior thigh, decreased trunk mobility and overall decrease in functional ability." (*Id.*)

On February 27, 1990, Lloyd was discontinued from therapy after frequently missed appointments. In total he was seen on four separate occasions and was treated with massage and hot packs. Because of Lloyd's poor compliance, he did not meet the treatment goals of a twenty-five percent increase in trunk mobility in 2–3 weeks, and an increase of fifty percent in six to eight weeks. (R. 322)

## 10. *Dr. Brown Medical Report*

On September 16, 1991, Dr. Brown examined Lloyd for the Illinois Bureau of Disability Determination Services in connection with his application for benefits. (R. 333) Brown related Lloyd's complaints of pain in the lower back with radiation into the right gluteal area, and occasional numbness in the right leg. (*Id.*) Brown noted that Lloyd reported that walking, bending, and lifting increase his discomfort, which is relieved by

---

**13.** The statement in the outpatient discharge note that Lloyd was seen for an initial assessment on February 11, 1990, (R. 322), is plainly an error. *See* (R. 317) (reflecting Lloyd's registration on February 1, 1990); (R. 330) (Indicating that an outpatient initial evaluation was conducted on February 1, 1990).

sitting and resting. (*Id.*) At the time of his consultation with Brown, Lloyd was walking with a cane. (*Id.*) Brown reported that Lloyd's range of voluntary motion of the lumbosacral spine was restricted. (R. 334) Brown also noted that "[t]he straight leg raising test is positive in the sitting position and positive in the recumbent position on the right at twenty degrees and on the left at sixty degrees," and that an examination of the hips revealed restricted and guarded motion on the right. (*Id.*) Measurement of the thighs and calves revealed a one-half inch decrease on the left leg. (R. 334) X-rays of the spine revealed small anterior spurs. (*Id.*) As a diagnosis, Brown offered chronic low back strain with right sided sciatica, and opined that Lloyd's condition appeared to be stable without treatment. (R. 335)

Brown also completed a Medical Assessment of Ability to do Work–Related Activities (Physical) report for Lloyd. (R. 336) In this report, Brown opined that Lloyd may: sit for 8 hours, stand for 4 hours, and walk for 4 hours in an 8–hour workday; may lift and carry up to five pounds frequently, and up to ten pounds occasionally; and, may bend and squat occasionally. (R. 336–337) Brown noted that Lloyd may not use his right foot for repetitive movements as in pushing and pulling of leg controls; however, Brown placed no similar restriction on Lloyd's left foot. (R. 337) Brown noted no restrictions on Lloyd's ability to handle objects, or his exposure to marked changes in temperature and humidity, or exposure to dust, fumes, and gases. (*Id.*) However, Brown did note a mild restriction on driving automotive equipment, a moderate restriction on being around moving machinery, and a total restriction on crawling, climbing, and unprotected heights. (*Id.*)

**11. Dr. Antia Report** (R.Ex. AC–3)

After the ALJ issued a decision finding Lloyd not disabled, and after Lloyd had filed a request for review of the hearing decision, Lloyd consulted with a psychologist, Dr. Kersey Antia, for purposes of psychological evaluation. Lloyd first met with Antia on May 20, 1992. Because Lloyd could not sit for long, the psychological evaluation was conducted over the course of four or five subsequent visits. (R. 355)

Antia administered the following assessment instruments: Developmental Test of Visual–Motor Integration; Adult Neuropsychological Questionnaire; Neuropsychological Symptoms Checklist; Screening Test for Luria–Nebraska Neuropsychological Battery; Multiscore Depression Inventory; Stress Inventory; Psychological Pain Inventory; MMPI–2; Wahler Physical Symptoms Inventory; Behavior Change Inventory; and, the Depression Check List. (R. 356) In addition, Antia conducted a clinical examination of Lloyd, reviewed his psychosocial history, and reviewed his medical records. (*Id.*)

In response to the items on the Neuropsychological Questionnaire and the Neuropsychological Symptoms Checklist—two self-report symptom inventories—Lloyd reported the presence of a variety of neuropsychological symptoms.[14] (R. 357) Lloyd's score on the Screening Test for the Luria–Nebraska Neuropsychological Battery also suggests some neuropsychological impairment. (R. 358) Lloyd's responses to the Multiscore Depression Inventory items evidenced various characteristics of depression and his total score placed him in the 99th percentile—suggesting very severe depression. (R. 357) Antia states that the results of the Psychological Pain Inventory "indicates that his physical symptoms started in 1978 after he sustained a back injury at work." (*Id.*) The results of Lloyd's MMPI–2 "suggests ex-

---

**14.** The neuropsychological symptoms reported by Lloyd include, just changes in his vision, things dropping out of his hands, trembling in his hands, forgetting what he was trying to say, loss of balance, memory impairment, dizzy spells, slurred speech, difficulty remembering the names of common objects, temporary blindness in one eye, and numbness just to name a few. (R. 357) Although there is not a hint of any of these symptoms in the various other medical records reviewed by the Court, Lloyd reported to Antia "that most of these symptoms appeared ... after his accident at work in 1978." (R. 357) In light of Lloyd's representation, as well as the fact that Lloyd could not have functioned well on his jobs had he had these impairments, Antia concluded that the symptoms are more likely to be attributable to his work injury than being preexisting symptoms. (*Id.*)

tremely severe depression and personality disintegration along with paranoid ideation, social isolation and over anxious disposition." (R. 358)

Antia reported that "[t]he overall impression generated by the results of various tests administered to him is that of a personality beset with many physical psychological and psychoneurological symptoms since his work injury in 1978." (R. 357) Based on the testing results, Antia concluded that Lloyd was "severely depressed, overanxious, paranoid, [and] socially isolated with many somatic and neuropsychological problems." (R. 358) Moreover, Dr. Antia opined that Lloyd was disabled by pain and psychoneurological impairments, and that the origin of those impairments was Lloyd's his injury in 1978. (R. 360). Antia's Axis I (Clinical Syndromes) diagnostic impressions were Dysthymia and generalized anxiety disorder. Antia indicated the absence of any Axis II (Developmental Disorders and Personality Disorders) disorders and Antia noted possible neuropsychological problems under Axis III (Physical Disorders and Conditions). (R. 359) Under Axis IV (Psychosocial Stressors), Antia noted that Lloyd's inability to work, lack of familial support and constant worry about the future constituted a moderate level of psychosocial stress. With respect to Lloyd's global assessment of functioning, (Axis V), Antia rated Lloyd's current level of functioning as severely impaired due to his depression. With respect to Lloyd's past level of functioning, Antia gave Lloyd a rating of 90 indicating the absence of, or minimal, symptoms in all areas.[15] (R. 359)

On July 17, 1992, Antia completed a Medical Assessment of Ability to do Work–Related Activities (Mental) in connection with Lloyd's application for benefits. (R. 377–378) Antia indicated that Lloyd's abilities to follow work rules, deal with the public, deal with work stresses, function independently, maintain attention/concentration, understanding, remember and carry out complex job instructions, behave in an emotionally stable man-

ner, relate predictably in social situations, and demonstrate liability, were "poor or none" (defined as "no useful ability to function in this area"). (*Id.*) However, Antia indicated that Lloyd's abilities to relate to co-workers, use judgment, interact with supervisors, understand, remember and carry out detailed, but not complex, job instructions, were "fair" (defined as "seriously limited, but not precluded"), and that Lloyd's ability to understand, remember and carry out simple job instructions, and maintain personal appearance was good (defined as "limited but satisfactory"). (*Id.*) Additionally, Antia completed a Supplemental Questionnaire as to Residual Functional Capacity. (R. 379–380) Antia indicated that the estimated impact of Lloyd's mental impairment on his ability to relate to other people was "moderate" (defined as "an impairment which affects but does not preclude ability to function"), while Lloyd's restriction of daily activities, deterioration in personal habits, and construction of interests, were "moderately severe" (defined as "an impairment which seriously affects ability to function"). (*Id.*) Dr. Antia estimated that the impact of Lloyd's mental impairment in the following functional capacities was moderate: ability to understand, carry out, and remember instructions; respond appropriately to supervision, respond appropriately to co-workers; and, perform simple tasks. (*Id.*) In addition, Antia rated the impact of Lloyd's mental impairment on his ability to perform repetitive tasks as "moderately severe", and Antia rated the impact of Lloyd's mental impairment on his ability to respond to customary work pressures, perform complex tasks, and perform varied tasks, on a sustained basis in a routine work setting as "severe" (defined as "an extreme impairment of ability to function). (R. 380) Dr. Antia also noted that the identified limitations lasted or could be expected to last for twelve months or longer; however, Antia offered no opinion on the Supplemental Questionnaire as to when the

15. In explaining the proper use of the DSM–III–R, The manual instructs that global assessment of functioning ratings should be made for two time periods: current and past year. The latter is defined as "the highest level of functioning for

at least a few months during the past year." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (THIRD EDITION—REVISED) 20 (1987).

level of severity she reported first existed. (*Id.*)

Procedural History

Lloyd filed an application for disability insurance benefits on October 10, 1989, claiming that he has been unable to work since March 14, 1979. (R. 167–170) His application was initially denied on February 23, 1990. (R. 171–172) Lloyd filed a request for reconsideration on April 27, 1990, which was denied on June 12, 1990. (R. 174, 175–176) Pursuant to Lloyd's request for a hearing by an administrative law judge, (R. 117), a hearing was held on March 20, 1991, before ALJ Russell Barone. (R. 115–166) Lloyd, accompanied by a non-attorney representative appeared and testified at the hearing. (*Id.*) On December 23, 1991, ALJ Barone issued a written decision denying Lloyd's claims. (R. 100–114) The Appeals Council granted Lloyd's request for review on October 23, 1992. In the correspondence granting review, the Appeals Council stated that it determined that the principles of *res judicata* barred reopening any determination for the period preceding July 2, 1980. The Appeals Council also stated that it agreed with the ALJ's determination that as of September 30, 1986, Lloyd's date last insured, he was capable of at least sedentary work. The Appeals Council did not agree with the ALJ's finding that Lloyd's RFC to perform the full range of sedentary work was reduced by back pain. Rather, the Council found that Lloyd retained the functional capacity to perform the full range of sedentary work. Accordingly, the Council proposed to issue a combined order of dismissal and decision dismissing that portion of Lloyd's request for hearing relating to the period through July 2, 1980, and finding Lloyd not disabled through September 30, 1986. (R. 340–342). The Appeals Council also found that Dr. Antia's report, dated July 17, 1992, was not relevant to the issue of Lloyd's disability prior to or on September 30, 1986. (R. 341–342). The Council invited Lloyd to request an appearance to present oral argument on the issues

of *res judicata* and whether he was disabled prior to September 30, 1986. (*Id.*)

On November 12, 1992, Lloyd filed a request for oral argument before the Appeals Council, but apparently the request was not timely associated with his file. (R. 350–351, 348–349) On January 13, 1993, the Appeals Council, without hearing oral argument, issued its proposed combined order of dismissal and decision affirming and modifying the ALJ's decision, and denying Lloyd's claim. (R. 345–347) On March 11, 1993, Lloyd filed another request for oral argument noting that Lloyd had, indeed, timely filed a request for a hearing on November 12, 1992. (R. 348–349) On June 18, 1993 the Appeals Council granted Lloyd's request for oral argument, and on July 27, 1993, Lloyd's non-attorney representative appeared before the Appeals Council. (R. 386, 391–415). The Appeals Council subsequently issued a decision affirming and modifying the ALJ's decision, and denying Lloyd's claim, on January 10, 1994. This decision became the final decision of the Secretary. (R. 7–13) Lloyd filed the instant action for judicial review on March 3, 1994.

The ALJ [16] found that Lloyd had a history of chronic back pain dating back to 1978, that this impairment did not meet or equal the level of severity set forth in the Listing of Impairments (Appendix 1 of Subpart P, Regulations No. 4), and that Lloyd "prior to and on September 30, 1986 ... retained the residual functioning capacity to perform sedentary work existing in significant numbers in the national economy." (R. 104–105, 112–113) Accordingly, the ALJ concluded that Lloyd was not disabled prior to the expiration of his insurance status on September 30, 1986. (R. 113–114)

In reaching his decision, the ALJ noted that while Lloyd's complaints of back pain over the years have been consistent, "objective findings *via* myelogram, CT scan and x-rays [were] mainly within normal limits." (R. 110) In addition, the ALJ observed that Dr. Gerhold explicitly found Lloyd capable of

16. The decision presently under review is that of Appeals Council which serves as the final decision of the Secretary. However, because the Appeals Council incorporated much of the ALJ's reasoning and findings into its decision, the Court shall first set out those portions of the ALJ's decision.

sedentary work in May, 1980, and that Dr. Rabinowitz, at the same time, noted that Lloyd was capable of medium exertional work. (R. 111) Additionally, the ALJ noted that a thorough examination in 1981 by Dr. Domoto and a physical capacities evaluation dated August 20, 1981[17], failed to find any severe impairment. (*Id.*) No further examination results are provided until Dr. Brown's post-hearing consultative examination. The ALJ noted that Dr. Brown's examination of Lloyd in August of 1991 revealed that Lloyd at least had the capacity for a wide range of sedentary work. (*Id.*) The ALJ discounted Dr. Gerhold's 1991 opinion that Lloyd's condition restricted him to less than sedentary work because Dr. Gerhold provided no supporting findings, and Lloyd simply failed to follow prescribed physical therapy at Ingalls Memorial Hospital. (*Id.*) Moreover, the ALJ noted that Lloyd's hearing testimony revealed that he engages in a number of activities which appear consistent with sedentary work. (*Id.*) Accordingly, the ALJ found that on September 30, 1986, Lloyd was still capable of performing sedentary exertional work. (*Id.*) Under Rule 201.21, Table No. 1, the ALJ found Lloyd not disabled when he last met the earning requirements in September 1986. (R. 111–12) In his enumerated findings, the ALJ explicitly noted that "[t]he claimant's subjective complaints of pain and limitations do not find support in the objective medical record to demonstrate he was incapable of performing sedentary work.... In fact, the medical records show the contrary—i.e. they show he was capable of at least sedentary [work] at that time." (R. 112 ¶ 4) The ALJ also explicitly found that "[p]rior to and on September 30, 1986, the claimant had the residual functional capacity to perform the physical exertional and non exertional requirements of sedentary work (20 C.F.R. 404.1545)." (R. 113 ¶ 5) Despite findings 4 and 5—indeed, in conflict with them, the ALJ also found that "[t]he claimant's residual functional capacity for the full range of sedentary work is reduced by back pain." (*Id.* ¶ 7)

Generally, the Appeals Council agreed with and adopted the ALJ's findings. (R. 11)

However, it determined that the ALJ's finding 7, contradicted findings 4 and 5 as well as the narrative portion of his opinion. (*Id.*) In light of these inconsistencies and in view of the fact that the evidentiary record, as set forth by the ALJ, "amply demonstrates that as of September 30, 1986, the claimant retained the functional capacity to perform the full range of sedentary work," the Council rejected the ALJ's finding 7. To the contrary, the Council found that "[o]n or before September 30, 1986, the claimant had the residual functional capacity for the full range of sedentary work." (R. 12 ¶ 7)

The Appeals Council fully considered Dr. Antia's report and the supporting research articles concerning the relationship between chronic pain and psychiatric disorder. (R. 9) Although finding it "arguably relevant," the Council did not find Dr. Antia's report sufficient to establish the existence of a medically determinable mental impairment on or before September 30, 1986. (R. 9) In reaching this determination, the Appeals Council observed that the report was uncorroborated by evidence contemporaneous with the period at issue and was "highly speculative." Specifically, the Appeals Council noted that Dr. Gerhold never made any mention of "signs, symptoms, or findings which could be construed as indicative of a mental impairment during the relevant period," and that Dr. Brown's examination in 1991 was similarly devoid of any such indication. (R. 10) Moreover, the Appeals Council noted that Lloyd never alleged a mental impairment when he filed any of his previous applications for disability benefits, and that prior to Dr. Antia's report the sole reference in the record to any psychological difficulties was Lloyd's brief statement at his hearing that his friends looked down upon him. (*Id.*)

The Appeals Council distinguished the instant case from others where retroactive diagnoses were used to establish prior existence of impairments (*e.g., Ray v. Bowen*, 843 F.2d 998 (7th Cir.1988) and *Brown v. Sullivan*, 737 F.Supp. 497 (C.D.Ill.1990)). The Council distinguished *Ray* by noting that in that case, there was corroborating evidence that permitted the relation back of the claim-

---

17. The physician's signature is illegible.

ant's alcohol problem—a problem, significantly, that "generally followed a pattern of readily definable and medically determinable stages." (R. 10) The Council distinguished *Brown* observing that *Brown* "involved borderline intellectual functioning, a lifelong condition." (*Id.*) With respect to the social science studies submitted by Lloyd's representative, which purported to establish a nexus between chronic pain and psychological disorders (and which purport to demonstrate that the associated psychological problems have their onset shortly after the pain producing trauma, the Council found the studies "theoretical in nature and unsupported by the evidence of this record as a whole." (*Id.*) The Council found "that the existence of such a causal relationship [between Lloyd's physical injury and the onset of psychological disorder] in the instant case for the purpose of establishing onset within the relevant period of time remains pure speculation." (*Id.*) Thus, the Council found the evidence to be of insufficient probative value. (*Id.*)

Therefore, the Appeals Council found that "[t]he medical evidence currently of record [did] not establish the existence of a medically determinable mental impairment ...," that "[Lloyd's] subjective complaints of pain and limitations did not preclude [him] from performing sedentary work ...," and that based on his exertional capacity for sedentary work, his age, education, and work experience, Lloyd was not disabled before the expiration of his insured status. (R. 12–13)

*Statutory and Regulatory Framework*

Under the Social Security Act a person is eligible for disability benefits if he or she: is insured for disability insurance benefits, has not attained retirement age, has filed an application for disability insurance benefits, and is under a disability. 42 U.S.C. § 423(a)(1). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." 42 U.S.C. § 423(d)(1)(A); *see also Lee v. Sullivan,* 988 F.2d 789, 792 (7th Cir.1992). A claimant is under a disability "only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ... in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

The Social Security Regulations outline a five-step inquiry to be followed when determining whether a claimant is disabled: (1) is the claimant presently unemployed; (2) is the claimant's impairment or combination of impairments severe; (3) does the impairment meet or exceed any of the list of specific impairments that the Secretary acknowledges to be so severe as to preclude substantial gainful activity; (4) if the impairment has not been listed by the Secretary as conclusively disabling, is the claimant unable to perform his or her former occupation; and (5) if the claimant cannot perform the past occupation, is the claimant unable to perform other work in the national economy in light of his or her age, education and work experience. *Pope v. Shalala,* 998 F.2d 473, 477 (7th Cir.1993).

"A negative conclusion at any step (except for step three) precludes a finding of disability. An affirmative answer at steps one, two or four leads to the next step. An affirmative answer at steps three or five results in a finding of disability." *Shields v. Sullivan,* 801 F.Supp. 151, 155 (N.D.Ill.1992). Upon reaching the fifth step, the rules in the Medical Vocational Guidelines of Regulation Part 404, Subpt. P, App. 2 (the "Grid") must be considered. *Id.* The Grid rules incorporate an analysis of the vocational factors of age, education, and work experience in combination with the claimant's RFC—defined in Social Security Ruling 83–10 as a "medical assessment of what an individual can do in a work setting despite functional limitations and environmental restrictions imposed by his or her medically determinable impairment(s)." "RFC is expressed in terms of a claimant's maximum sustained work capability for either 'sedentary,' 'light,' 'medium,' 'heavy,' or 'very heavy' work as those terms

are defined by Reg. § 404.1567." *Shields,* 801 F.Supp. at 155. In determining if work is available for the claimant in the national economy, the ALJ may use a vocational expert (Reg. § 404.1566(e)), and if there is work available, then a finding of not disabled must result. Reg. §§ 404.1520(f)(1), .1566(b).

*Standard of Review*

Section 205(g) of the Social Security Act provides that a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The statute further provides that "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive. . . ." *Id.* Substantial evidence means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Luna v. Shalala,* 22 F.3d 687, 689 (7th Cir.1994) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). Thus, a reviewing court will not "reevaluate the facts, reweigh the evidence or substitute [its] own judgment for that of the Secretary." *Luna,* 22 F.3d at 689.

### ANALYSIS

Lloyd makes four principal arguments in support of his contention that the Secretary's decision denying him Social Security disability benefits is not supported by substantial evidence. Pl.'s Mot. for Summ.J. at 10–12.

First, Lloyd contends that Dr. Antia's evaluation shows that he has been disabled due to depression at least since before the expiration of his insured status. *Id.* at 8. Because Dr. Antia evaluated Lloyd almost six years after the expiration of his insured status, and approximately 13–14 years after the accident identified by Dr. Antia as responsible for Lloyd's mental impairment, Lloyd attempts to buttress this argument by citing medical studies which indicate a causal relationship between chronic pain and depression. *Id.* at 8–9. Lloyd appears to be arguing that because he has suffered from chronic pain since 1978, and medical studies suggest that chronic pain can cause depression, the diagnosis of depression made in 1992 by Dr. Antia should be related back to the accident in 1978. *Id.* at 9. Lloyd also argues that because Dr. Antia's report was not in existence at the time of the hearing before the ALJ, and was only examined by the Appeals Council, the court should at least order a remand to enable the ALJ to examine the report and consult a medical advisor to establish the onset date of this alleged disability. *Id.* at 14–16.

Second, Lloyd briefly alleges that the Secretary ignored Dr. Gerhold's most recent medical opinion about his alleged physical disability. *Id.* at 10.

Next, Lloyd faults the Appeals Council for reversing one of the ALJ determinations about his pain; He argues that because he did not appear before the Appeals Council it was not in a position to make a credibility determination about his claims of pain, and consequently its finding about his pain was not supported by substantial evidence. *Id.* at 11–12.

Finally, Lloyd argues that because pain and depression are nonexertional impairments a vocational expert, as opposed to the Grid, should have been consulted by the Secretary when establishing whether jobs exist in the national economy that Lloyd could perform at his exertional level. *Id.* at 12.

We will address Lloyd's arguments *seriatim.* Lloyd's first argument, that his case should be remanded to permit the ALJ to consider Dr. Antia's report, need not detain us long. The Court may remand a case to the Secretary to consider additional evidence only if the additional evidence is "new, material, and there is good cause for not introducing it during the administrative proceedings." *Sears v. Bowen,* 840 F.2d 394, 399 (7th Cir.1987) Dr. Antia's report and the scientific evidence submitted in this case is not "new or material" in the requisite sense because it was explicitly considered by the Appeals Council in reaching the determination that became the final decision of the Secretary. Where, as here, there is a decision of the Appeals Council, it and not the decision of the ALJ is reviewed as the final decision of the Secretary. *Stein v. Sullivan,*

892 F.2d 43, 46 (7th Cir.1989); *Bauzo v. Bowen*, 803 F.2d 917, 920–21 (7th Cir.1986). Because the Appeals Council explicitly considered and discounted Dr. Antia's report in reaching its determination, that report does not constitute "new" or "material" evidence, and is therefore not a proper basis for directing a remand under section 405(g). The cases cited by Lloyd do not indicate a contrary result as they involve situations in which the evidence deemed "new" by the reviewing courts was not considered by either the ALJ or the Appeals Council. *See, e.g., Sears v. Bowen*, 840 F.2d 394 (7th Cir. 1987) (involving evidence first submitted ten months after the appeals council issued its decision); *Kemp v. Weinberger*, 522 F.2d 967, 968 (9th Cir.1975) (granting remand to consider evidence presented for the first time before the district court).

■ Because Dr. Antia's report was considered by the Secretary, the only relevant issue involving Lloyd's claim of mental impairment is whether, in light of Dr. Antia's report, the determination by the Secretary that Lloyd was not mentally disabled on or before September 30, 1986 is supported by substantial evidence. The Appeals Council found Dr. Antia's report "highly speculative and uncorroborated by other evidence contemporaneous with the period at issue." (R. 9) In making this determination, the Appeals Council noted that at no time did Lloyd allege a mental disability prior to his visit with Dr. Antia and that none of the doctors that treated Lloyd over the thirteen to fourteen year period between Lloyd's work accident and Dr. Antia's examination ever suggested that he was suffering from any such disability. (R. 10) The Appeals Council also indicated that it discounted Dr. Antia's findings, in part, because Antia was not Lloyd's treating physician—whose opinion would ordinarily be given great weight—but rather, was merely a consulting psychologist who

first examined Lloyd 5½ years after his insured status expired. (R. 10)

It is apparent that the Appeals Council fully considered the record as a whole in evaluating Lloyd's claim of a mental impairment. As the Appeals Council correctly observed, Lloyd's medical records spanning approximately thirteen years do not contain a shred of evidence corroborating the conclusion that Lloyd suffered from a mental impairment—no less a severe mental impairment.[18] Moreover, despite being asked several times by his advocate about the emotional consequences of his disability, Lloyd gave no indication that he was suffering from depression or any other psychological disorder. Our role as a reviewing court is not to reweigh the evidence considered by the Appeals Council; rather, we serve the limited role of ascertaining whether the decision of the Appeals Council is supported by substantial evidence. In view of the Appeals Council's analysis of the record as a whole, the Court is unable to conclude that the Council's determination that Lloyd was not suffering from a mental disability prior to the expiration of his insured status is not substantially supported.[19]

■ Lloyd's second argument, that the Secretary ignored one of Dr. Gerhold's medical opinions—which Lloyd alleges shows his medical disability, ignores the Secretary's analysis of the various medical opinions. In the first place, the Secretary did consider Dr. Gerhold's most recent medical opinion, upon which Lloyd now relies, but, in making her decision, she also took into account the rest of the medical evidence before her. Most notably, the Secretary observed that Dr. Gerhold's opinion rendered in 1991 that Lloyd was unable to perform sedentary work was not accompanied by supporting findings. (R. 10) And, significantly, as noted by the ALJ, Gerhold's previous opinions, which

---

**18.** In this regard, we note that some of the symptoms of neuropsychological impairment reported by Antia appear relatively severe. *See* note 14 *supra*. It strikes this Court as highly improbable that Lloyd would not alert his physician to some of these symptoms—*e.g.*, temporary blindness in one eye, inability to name common objects, slurred speech, and numbness—if he was in fact experiencing them.

**19.** In view of the fact that the Secretary's determination that Lloyd did not suffer from a mental impairment prior to the expiration of his insured status is supported by substantial evidence, a remand to determine a precise onset date of Lloyd's newly diagnoses mental impairment is unnecessary.

were rendered relatively contemporaneously with the alleged onset of Lloyd's disability, indicated that Lloyd could perform sedentary work. (R. 4). The Secretary also relied on opinions of other doctors—and the various negative x-rays, CT scans and myelogram—, in reaching the conclusion that Lloyd was not disabled prior to the expiration of his eligibility for disability benefits. (*See, e.g.,* R. 105–06 (Dr. Rabinowitz); R. 106 (Dr. Domoto); R. 109 (Dr. Brown)) In light of the wide array of evidence indicating that Lloyd could perform at least sedentary work, the Court cannot conclude that the Secretary's determination that he was not disabled is without substantial support.

Lloyd's argument that the Appeals Council erred in rejecting the ALJ's finding that Lloyd's residual functional capacity was reduced by pain, is unpersuasive. Lloyd contends that because the Appeals Council did not see Lloyd testify and therefore did not have the opportunity to observe his demeanor as did the ALJ, the Council should not have upset the ALJ's credibility determination. However, it is far from clear that the ALJ's finding 7 reflected a deliberate credibility determination. The ALJ made no explicit credibility findings and, to the extent that he implicitly rendered any opinion as to Lloyd's credibility, he appeared to find Lloyd's testimony not credible. *See* R. 112 ¶ 4 ("The claimant's subjective complaints of pain and limitations do not find support in the objective medical record to demonstrate he was incapable of performing sedentary work...."). The Appeals Council rejected finding 7 as inconsistent with the ALJ's other findings—specifically including finding 4. (R. 11) Moreover, the Appeals Council noted that finding 7 was inconsistent with the narrative portion of the ALJ's decision, wherein the ALJ expressed his finding that Lloyd was capable of performing a full range of sedentary work prior to the expiration of his eligibility for disability insurance. (R. 110–111). The Appeals Council thoroughly reviewed the medical evidence in the record; in view of that evidence, the Court cannot conclude that the Council's finding that Lloyd could perform the full range of sedentary work is without substantial support.

 Lloyd's final claim, that because of his nonexertional limitations the Secretary was required to call on a vocational expert, instead of consulting the Grid, to establish whether jobs existed in the national economy which Lloyd could perform, also is without merit. Generally, where nonexertional impairments are present, a vocational expert must be consulted to determine the ability of a claimant to perform jobs available in the economy. *Pugh v. Bowen,* 870 F.2d 1271, 1277 n. 6 (7th Cir.1988). Lloyd argues that in his case a vocational expert should have been consulted because the ALJ found that his residual functional capacity was reduced by pain, a nonexertional impairment. Pl.'s Mot. for Summ.J. at 12. However, the Court has determined that the Secretary's decision that Lloyd was capable of performing a full range of sedentary work despite his pain or depression, was supported by substantial evidence. Therefore, the Secretary acted properly when she used the Grid to establish that Lloyd was not disabled rather than relying on a vocational expert.

### CONCLUSION

For all the foregoing reasons, the court holds that substantial evidence supports the ALJ's determination that Lloyd was not "disabled" as of his date last insured as defined by the Social Security Act. While the court fully sympathizes with Mr. Lloyd's current medical condition, it cannot conclude, in light of all the evidence in the record, as well as the stringent legal standards for finding a person disabled, that the Secretary's determination is not substantially justified. Accordingly, Lloyd's motion for summary judgment and/or remand [20–1, 20–2] is denied, and the Secretary's motion for summary judgment [17–1] is granted. Judgment is entered in favor of the Secretary and against Lloyd.